IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| NIL GOVIND DAS, SAED GULED, STEFFANI MOWAT, ROSARIO JUAREZ ALEGRIA, VICTOR ESCOBEDO, and JORGE ROSILLO ZARAGOZA, on behalf of themselves and others similarly situated,<br><br><br><br>Plaintiffs,<br><br>v.<br><br>BERT BRANTLEY, in his official capacity as Commissioner of the Georgia Department of Driver Services,<br><br><br>Defendant. | Civil Action No.<br><br><br><br><br>**COMPLAINT—CLASS ACTION** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

## NATURE OF THE ACTION

1.      This action challenges a policy of the Georgia Department of Driver Services ("DDS") which discriminatorily denies driver's licenses to certain non-citizens living in Georgia on the basis of their alienage and which usurps the federal government's exclusive authority to determine immigration status and to classify non-citizens' immigration status.

2.      DDS policy dictates that non-citizens who have current lawful status within the meaning of the federal REAL ID Act and federal employment authorization based on their pending applications to adjust status to lawful permanent resident—but who are unable to demonstrate continuous past authorized presence in the United States—are categorically ineligible for Georgia's driver's licenses.

3.      This policy violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by unlawfully discriminating on the basis of alienage against non-citizens whose stay in the United States is currently federally authorized. DDS policy also violates the Supremacy Clause of the U.S. Constitution by requiring state DDS officials to determine and classify the immigration status of non-citizen driver's license applicants in a manner inconsistent with federal law. DDS' policy intrudes on the federal government's

exclusive authority to make immigration status classifications. The individually named Plaintiffs bring this action on behalf of themselves and a class of all others similarly situated to obtain preliminary and permanent injunctive relief and a declaration that DDS' policy violates the Fourteenth Amendment and is preempted by federal law.

4.    DDS' policy is subjecting thousands of Georgians, including Plaintiffs and members of the proposed class, to irreparable harm by depriving them of the vital ability to drive. DDS policy sharply curtails the ability of Plaintiffs and class members to drive their children to school and medical appointments, to attend religious services, to seek and maintain employment, to establish and run small businesses, and to otherwise participate in the life of the communities in which they seek permanent residence.

5.    If the individuals affected by this policy do drive, they are subject to criminal prosecution for driving without a Georgia license. Penalties range from a minimum of a $500 fine and from two days to up to a year imprisonment for the first offense, with penalties rising to a maximum of five years in prison and a $5,000 fine for the fourth (or subsequent to the fourth) offense. *See* Ga. Code Ann. §§ 40-5-20(a), 40-5-121(a). A conviction for driving without a Georgia license could also lead to the suspension of driving privileges in the future, *id.* § 40-5-

121(b)(1), and could negatively impact future efforts to obtain immigration relief. *See, e.g.*, 8 U.S.C. § 1182(a)(2)(B) (making inadmissible certain aliens convicted of multiple offenses).

6.    Plaintiffs and members of the proposed class will continue to suffer serious and irreparable harm if DDS' policy is not enjoined.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343 because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' and class members' civil rights and to secure equitable or other relief for the violation of those rights.

8.    Plaintiffs seek declaratory, injunctive and other appropriate relief, pursuant to 28 U.S.C. §§ 2201 and 2202; Federal Rules of Civil Procedure 23, 57, and 65; and 42 U.S.C. § 1983.

9.    Venue is proper under 28 U.S.C. § 1391(b) and Local Rule 3.1. Defendant is sued in his official capacity and his office resides within this District and this Division. All but one of the DDS offices where the representative

Plaintiffs applied for driver's licenses are located within this Division, and all such offices are located within this District. DDS is refusing to issue driver's licenses to Plaintiffs pursuant to a policy that was generated and is administered by DDS' headquarters in Conyers, Georgia, which is located within this District and this Division. Ga. Comp. R. & Regs. R. 375-1-1-.01(2).

## PARTIES

### Plaintiffs

10.     Plaintiff **Nil Govind Das** was born in India and is not a U.S. citizen. He currently resides in Atlanta, Georgia.

11.     Das has filed a form I-485 application for adjustment of status to lawful permanent resident based on his marriage to a U.S. citizen. That application is pending with United States Citizenship and Immigration Services ("USCIS"). USCIS granted Das work authorization and issued him an Employment Authorization Document ("EAD") showing his federal classification as a non-citizen with an application to adjust status to permanent residency pursuant to 8 C.F.R. § 274a.12(c)(9) (2016). The EAD authorizes him to work in the United States until February 14, 2017, and he is eligible to renew it as long as his application to adjust status is pending. Das cannot prove to DDS' satisfaction that

his presence in the United States was continuously authorized prior to filing his application for adjustment of status.

12.     DDS had granted Das a driver's license in previous years based on his pending application for adjustment of status. In February 2016, however, DDS denied his application to renew his driver's license. Following a new DDS policy, DDS staff informed Das that he is not eligible for a license because they believe he lacked lawful immigration status before applying for adjustment of status to lawful permanent resident. DDS staff further informed Das that he is ineligible for a driver's license until his application to adjust status is granted.

13.     As a result of DDS' decision to deny him a license, Das has experienced significant disruption to his ability to seek and maintain employment, especially because he is no longer able to work in his previous capacity as an Uber driver. Das is also unable to volunteer at his temple, and must depend on his spouse, who has a license, for basic transportation needs such as going to work and shopping for groceries.

14.     Plaintiff **Saed Guled** was born in Somalia and is a citizen of Canada. He is not a U.S. citizen. Guled resides in Stone Mountain, Georgia.

15.     Guled has filed a form I-485 application to adjust status to lawful permanent resident based on his marriage to a U.S. citizen. The application is

currently pending with USCIS. USCIS granted Guled work authorization and

issued him an EAD showing his federal classification as a non-citizen with an

application to adjust status to permanent residency pursuant to 8 C.F.R. §

274a.12(c)(9). The EAD authorizes him to work in the United States until February

11, 2017, and he is eligible to renew it as long as his application to adjust status is

pending. Guled has been unable to prove to DDS' satisfaction that his presence in

the United States was continuously authorized prior to filing his application for

adjustment of status.

        16.    DDS had previously granted Guled a driver's license based on his

pending application for adjustment of status. In February 2016, however, DDS

denied Guled's application to renew his driver's license. Following a new DDS

policy, DDS staff denied Guled a license because DDS officials believe that Guled

lacked lawful status at some point before he applied for adjustment of status to

lawful permanent resident. DDS staff told Guled that he will not be eligible for a

driver's license until his application to adjust status is granted.

        17.    As a result of DDS' decision to deny him a license, Guled faces

extreme difficulty maintaining his business installing cabinets in people's homes.

Because he cannot lawfully drive, Guled's ability to visit customers' homes to plan

and supervise projects has been substantially curtailed.  He is also denied the ability to legally drive his children to school and other activities.

18.     Plaintiff **Steffani Mowat** was born in Canada and is a citizen of Canada. She is not a U.S. citizen. Mowat resides in Vinings, Georgia.

19.     Mowat has filed an I-485 application to adjust status to lawful permanent resident based on having been a victim of domestic violence by a U.S. citizen spouse; that application is pending with USCIS. USCIS granted Mowat work authorization and issued her an EAD showing her federal classification as non-citizen with an application to adjust status to permanent residency pursuant to 8 C.F.R. § 274a.12(c)(9). The EAD authorizes her to work in the United States until December 15, 2016 and is eligible for renewal while her application to adjust status is pending. Mowat cannot prove to DDS' satisfaction that her presence in the United States was continuously authorized prior to her applying for adjustment of status.

20.     In February 2016, DDS refused to issue Mowat a driver's license. DDS staff said Mowat would not be eligible for a driver's license unless she presented to DDS proof that she had never been present in the United States without lawful status. Without a driver's license, it is very difficult for Mowat to

commute to her job at a marketing company in downtown Atlanta, where she is required to work long hours.

21.     Plaintiff **Rosario Juarez Alegria** was born in Mexico and is a citizen of Mexico. She is not a U.S. citizen. She resides in Calhoun, Georgia.

22.     Juarez Alegria has filed an I-485 application to adjust status to lawful permanent resident based on having been present in the United States with a U visa for at least three years.[1] Her application to adjust status is pending with USCIS. USCIS granted Juarez Alegria work authorization and issued her an EAD showing her federal classification as non-citizen with a pending application to adjust status to permanent residency pursuant to 8 C.F.R. § 274a.12(c)(9). The EAD authorizes her to work in the United States until February 2, 2017 and is eligible for renewal while her application to adjust status is pending. Juarez Alegria cannot prove that her presence in the United States was continuously authorized prior to her applying for adjustment of status.

---

[1] A U visa, or U nonimmigrant status, may be granted to a non-citizen victim of a significant crime who has suffered substantial physical or mental harm as a result of their victimization.  *See* 8 C.F.R. § 214.14(b) (2016) (describing eligibility requirements). For a victim to obtain the visa, a law enforcement officer must certify that the victim has been or is likely to be helpful to law enforcement in investigating or prosecuting the crime. *Id.* After three years in U nonimmigrant status, the U visa holder is eligible to apply for adjustment of status to lawful permanent resident. *See* 8 C.F.R. § 245.24(b)(3) (2016).

23.     In February 2016, DDS denied Juarez Alegria's application to renew her driver's license. When Juarez Alegria told DDS staff, in response to a question, that she had entered the United States without authorization, DDS staff told her that she would not be eligible for a driver's license until she got her green card, also known as a permanent residency card. Without a driver's license, it is very difficult for Alegria Juarez to commute to her job at a carpet factory, where she works an early morning shift, and to transport her children to their appointments and activities.

24.     Plaintiff **Victor Escobedo** was born in Mexico and is not a U.S. citizen. Escobedo currently resides in Kennesaw, Georgia.

25.     Escobedo has filed a Form EOIR 42B Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents. That application is currently pending with the Immigration Court in Atlanta.

26.     USCIS granted Escobedo work authorization and issued him an EAD showing his federal classification as non-citizen with an application to cancel removal and adjust status to permanent residency pursuant to 8 C.F.R. § 274a.12(c)(10). The EAD authorizes him to work in the United States until September 15, 2016 and is eligible for renewal while his application for cancellation of removal and adjustment of status is pending. Escobedo cannot

prove that his presence in the United States was continuously authorized prior to his applying for adjustment of status.

27.    DDS had previously granted Escobedo a driver's license based on his pending application for cancellation of removal and adjustment of status. In February 2016, however, DDS denied Escobedo's application to renew his driver's license. At that time, DDS staff told Escobedo that he is ineligible for a license because DDS believes he lacks legal status in the United States. DDS staff also told Escobedo that he will not be eligible for a license until his application to adjust status is approved.

28.    Without a driver's license, it is impossible for Escobedo to both comply with the law and do his job as a handyman, which requires him to drive long distances throughout Georgia and to other states to work in customers' homes and businesses. Escobedo's income supports his wife and three U.S. citizen children.

29.    Plaintiff **Jorge Rosillo Zaragoza** was born in Mexico and is not a U.S. citizen. Rosillo Zaragoza currently resides in Forest Park, Georgia.

30.    Rosillo Zaragoza has filed a Form EOIR 42B Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent

Residents. That application is currently pending with the Immigration Court in Atlanta.

31.     USCIS granted Rosillo Zaragoza work authorization and issued him an EAD showing his federal classification as non-citizen with an application to cancel removal and adjust status to permanent residency pursuant to 8 C.F.R. § 274a.12(c)(10). The EAD authorizes him to work in the United States until November 25, 2016 and is eligible for renewal while his application for cancellation of removal and adjustment of status is pending. Rosillo Zaragoza cannot prove that his presence in the United States was continuously authorized prior to his applying for adjustment of status.

32.     DDS had previously granted Rosillo Zaragoza a driver's license based on his pending application for cancellation of removal and adjustment of status. In December 2015, however, DDS denied Rosillo Zaragoza's application to renew his driver's license. At that time, DDS staff told Rosillo Zaragoza that he will not be eligible for a driver's license until his application to adjust status is approved.

33.     Without a driver's license, it is impossible for Rosillo Zaragoza to both comply with the law and do his job as a construction worker, which requires him to travel long distances from his home to worksites throughout Georgia.

Zaragoza also needs a license to drive his blind daughter home from work and school, and to bring her to medical appointments.

## Defendant

34.     Defendant **Bert Brantley** is the Commissioner of the Georgia Department of Driver Services ("DDS"). Georgia law provides that DDS "shall be under the direction, control, and management of the Board of Driver Services and the commissioner of driver services." Ga. Code Ann. § 40-16-3(a). Georgia law further provides that "the commissioner shall be the chief executive officer of the department, subject to the policies established by the board." *Id*. § 40-16-3(e). As such, Defendant Brantley is responsible for the enforcement of DDS policy in Georgia and is an appropriate defendant in this case. Defendant Brantley is sued in his official capacity.

## LEGAL FRAMEWORK

### Federal Law Governing Immigration Classification and Issuance of Driver's Licenses to Non-Citizens

35.     The federal government has exclusive power to determine and regulate the immigration status of non-citizens in the United States. The U.S. Constitution grants the federal government the power to "establish an uniform Rule

13

of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3.

36.    Congress has created a comprehensive system of federal laws regulating immigration and enforcing immigration law through the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. §§ 1101 *et seq.* (2016). The INA contains complex and exclusive procedures for determining immigration and citizenship status. The federal government has established specialized agencies and courts to determine the immigration status of individuals, to enforce immigration law, and to effectuate immigration policy. *See* 8 U.S.C. §§ 1101(b)(4), 1229a, 1551 *et seq.* (2016); 8 C.F.R. §§ 2.1, 1003.1 *et seq.* (2016).

37.    The extensive federal statutory and regulatory scheme governing immigration classifications leaves no room for supplemental state laws or policies that classify non-citizens. States have no authority to create immigration classifications that do not exist in federal law, nor to assess the legality of a non-citizen's presence or status in the United States separately from the federal government.

38.    Under the INA, a non-citizen's immigration status may be subject to change over time. For example, a non-citizen who enters the United States with authorization—e.g., with a tourist visa—might remain in the country past his

14

period of authorized stay. However, he may later acquire lawful permanent resident status by a means approved by Congress—for example, through marriage to a U.S. citizen. *See* 8 U.S.C. § 1255 (2016). Another person might enter the United States without authorization from the federal government, but later become eligible to cancel removal proceedings instituted against her by the federal government and adjust status to lawful permanent resident—for example, based on a showing that her United States citizen spouse or child would suffer exceptional and extremely unusual hardship if she were removed from the United States. *See* 8 U.S.C. § 1229b(b) (2016).

39.    With the federal REAL ID Act, Congress set standards for the issuance of state driver's licenses that federal agencies will accept for official purposes, such as accessing federal facilities and boarding federally regulated aircraft. Pub. L. No. 109-13, § 201(3), 119 Stat. 231, 313 (codified at 49 U.S.C. § 30301 note).

40.    The REAL ID Act provides that the Secretary of Homeland Security shall determine whether a state is meeting the requirements of the REAL ID Act based on certifications made by the state to the Secretary of Homeland Security. Pub. L. No. 109-13, § 202(a)(2). A state may receive federal grant money to assist it in complying with the Act. *Id.* § 204(a).

41.     Georgia, along with at least 21 other states and the District of Columbia, has agreed to comply with REAL ID, thereby ensuring that its residents may use their Georgia driver's licenses to enter federal facilities and board commercial domestic flights.[2]

42.     To issue a REAL ID-compliant driver's license to an applicant, a state must require documentary evidence that the applicant has "lawful status," as defined by the REAL ID Act. *Id.* § 202(c)(2)(B).

43.     The REAL ID Act establishes nine categories of persons who have "lawful status," as required to receive a REAL ID-compliant driver's license: (1) citizens or nationals of the United States; (2) aliens lawfully admitted for permanent or temporary residence in the United States; (3) aliens with conditional permanent resident status in the United States; (4) aliens who have an approved application for asylum in the United States or who entered into the United States in refugee status; (5) aliens with a valid, unexpired nonimmigrant visa or nonimmigrant visa status for entry into the United States; (6) aliens with a pending application for asylum in the United States; (7) aliens with a pending or approved application for temporary protected status in the United States; (8) aliens with

---

[2] Press Release, Gov. Nathan Deal, Office of the Governor, Homeland Security Determines Georgia Compliant with Real ID (Dec. 21, 2012), https://gov.georgia.gov/press-releases/2012-12-21/homeland-security-determines-georgia-compliant-real-id.

approved deferred action status; and (9) aliens with a pending application for adjustment of status to that of an alien lawfully admitted for permanent residence in the United States or conditional permanent resident status in the United States. Pub. L. No. 109-13, § 202(c)(2)(B), 119 Stat. 231, 313 (codified at 49 U.S.C. § 30301 note); 6 C.F.R. § 37.3 (2016).

44.     A person who is not a U.S. citizen and is physically present in the United States may be eligible to adjust status to lawful permanent resident based specific criteria, such as her marriage to a U.S. citizen or her status as an asylee, refugee, or a victim of certain crimes. This application is accomplished by filing USCIS Form I-485, titled "Application to Register Permanent Residence or Adjust Status."

45.     A person who has filed an I-485 application to adjust status to lawful permanent resident may apply for USCIS authorization to work lawfully in the United States. 8 C.F.R. § 274a.12(c)(9) (2016). If USCIS grants work authorization, it issues that person an Employment Authorization Document ("EAD"). The EAD is coded to show that its holder is in category (c)(9) (shorthand for 8 C.F.R. § 274a.12(c)(9)), a category comprised of people with pending I-485 applications for adjustment of status to lawful permanent resident.

46.     A non-citizen who is in removal proceedings in Immigration Court, has been physically present in the United States for at least ten years, can show good moral character during his residence, and has a U.S. citizen or lawful permanent resident parent, child or spouse who would suffer exceptional and extremely unusual harm if the non-citizen were removed may also apply to adjust status to lawful permanent resident.  *See* 8 U.S.C. § 1229b(b) (2016). To accomplish this, the non-citizen must file a form EOIR-42B application for cancellation of removal and to adjust status before an immigration judge.

47.     Grants of applications to cancel removal and adjust status are capped at 4,000 per year nationwide.[3] 8 C.F.R. § 1240.21 (2016). After the cap is reached, the grant of pending applications must be deferred until the next fiscal year. Even after the cap is reached, however, the Immigration Court may continue to deny applications that fail to establish certain statutory requirements for relief. 8 C.F.R. § 1240.21(c)(1) (2016).

48.     A person who has filed a form EOIR-42B application to adjust status may apply to USCIS for authorization to work lawfully in the United States. 8 C.F.R. § 274a.12(c)(10) (2016). If USCIS grants work authorization to a person

---

[3] This cap also encompasses suspension of deportation applications, but these applications must have been filed prior to April 1, 1997 and thus remain available only in very limited circumstances.

who has applied for cancellation of removal and adjustment of status, USCIS issues that person an EAD. The EAD is coded to show that the recipient is in category (c)(10) (shorthand for 8 C.F.R. § 274a.12(c)(10)), a category comprised of people with pending EOIR-42B applications to cancel removal and adjust status to lawful permanent resident.

49.    Under the REAL ID Act, if a person presents evidence of a pending application for adjustment of status as the basis for the issuance of a driver's license, then the state may issue a temporary driver's license. Pub. L. No. 109-13, § 202(c)(2)(C)(i), (ii).  A temporary driver's license is valid only during the period of time of the applicant's authorized stay in the United States or, if there is no definite end to the period of authorized stay, a period of one year. *See id.*

50.    To be eligible for a REAL ID-compliant driver's license, a person must present documents demonstrating identity and lawful status in the United States, as determined by USCIS. Pub. L. No. 109-13, § 202(c). An EAD is evidence of identity under federal regulations implementing the REAL ID Act. 6 C.F.R. § 37.11(c)(1)(v) (2016). If a person presents an EAD as evidence of identity, he or she must present a second document "issued by DHS [the Department of Homeland Security] or other Federal agencies demonstrating lawful status as determined by USCIS." 6 C.F.R. § 37.11(g)(2) (2016).

51.     An applicant can demonstrate that he has a pending application to adjust status to lawful permanent resident by showing a Form I-797C Notice of Action issued by USCIS that reflects receipt of an application to adjust status.

52.     To issue REAL ID-compliant licenses, states must enter into memoranda of understanding with the Secretary of Homeland Security to routinely use the Systematic Alien Verification for Entitlements ("SAVE") system, established by USCIS, to "verify the legal presence status of a person, other than a United States citizen, applying for a driver's license or identification card." Pub. L. No. 109-13, § 202(c)(3)(C).

**<u>Georgia Law and Policy Governing Issuance of Licenses to Non-Citizens</u>**

53.     Georgia law provides that DDS "shall, upon payment of the required fee, issue to every applicant qualifying therefor a driver's license indicating the type or general class of vehicles the licensee may drive . . . ." Ga. Code Ann. § 40-5-28.

54.     Georgia law provides that a person "may be issued a temporary [driver's] license" if he or she "presents in person valid documentary evidence of" "federal documentation verified by the United States Department of Homeland Security to be valid documentary evidence of lawful presence in the United States

under federal immigration law" or "[v]erification of lawful presence as provided by Code Section 40-5-21.2."[4] Ga. Code Ann. § 40-5-21.1(a).

55.    Under Georgia law, a temporary license issued by DDS is "valid only during the period of time of the applicant's authorized stay in the United States or five years, whichever occurs first." Ga. Code Ann. § 40-5-21.1(a).

56.    DDS does not uniformly treat people who are deemed by the federal government to have lawful status for the purposes of obtaining driver's licenses as eligible for driver's licenses in Georgia.

57.    Under recently initiated DDS policy, a person with a pending adjustment of status application will not be granted a driver's license if DDS determines that the person cannot prove authorized entry and authorized presence for all periods in which they resided in the United States.

## **FACTS**

58.    Plaintiff **Nil Govind Das** lives in Atlanta, Georgia.

---

[4] Section 40-5-21.2 of the Georgia Code requires DDS to "attempt to confirm through the SAVE program that the applicant is lawfully present in the United States." Ga. Code Ann. § 40-5-21.2(b)(1). If the SAVE program does not provide sufficient information to make that determination, DDS is "authorized to accept verbal or e-mail confirmation of the legal status of the applicant from the Department of Homeland Security." *Id.* § 40-5-21.2(b)(2).

59.     Das, who is a citizen of India, entered the United States in 2005 on a R-1 visa to work as a priest.

60.     Das subsequently married a U.S. citizen. In 2011, Das applied to adjust his status to lawful permanent resident based on his marriage. Das's application for adjustment of status is still pending.

61.     Das has an EAD issued by USCIS which allows him to work in the United States from February 15, 2016 to February 14, 2017. Das's EAD reflects that he is in category (c)(9), indicating that he has a pending I-485 application for adjustment of status. In previous years, Das has received EADs from USCIS based on his pending application for adjustment of status. In previous years, Das received driver's licenses from DDS after presenting his EAD to DDS.

62.     Das's most recent Georgia driver's license expired on February 14, 2016.

63.     In February 2016, Das applied for a Georgia driver's license by going in person to a DDS office in Atlanta, Georgia. There, he presented to DDS his Indian passport, EAD, Social Security card, and documents showing his name and home address.

64.     In previous years, DDS deemed such documentation sufficient to grant Das a driver's license. During Das's February 2016 visit, however, a DDS

22

clerk refused to issue him a driver's license, but rather gave Das a letter saying that his application would be reviewed by the DDS Office of Investigative Services ("OIS"), and that he should call that office after three business days.

65.     About one week later, Das called OIS.  Investigator Slater at OIS asked Das when and how he had entered the United States, and he asked Das to send his I-94 form[5] and a copy of his application for residency to OIS. Das then emailed Investigator Slater various documents, including copies of his Indian passport, his R-1 visa, his I-94 form reflecting his admission into the United States in 2005, and the Form I-797C he received from USCIS reflecting receipt of his application for adjustment of status.

66.     After Das sent Investigator Slater those documents, Investigator Slater called Das and told him that he is not entitled to a driver's license because his R-1 visa expired in 2008. Slater stated that after the expiration of the R-1 visa, Das was not in lawful status. Investigator Slater said Das would not be eligible for a driver's license until USCIS approved his application to adjust status to lawful permanent resident.

---

[5] Form I-94 is a document issued by U.S. Customs and Border Protection to foreign visitors who are lawfully admitted to the United States. The I-94 reflects a departure date by which the visitor is required to exit the United States. *See* https://www.cbp.gov/sites/default/files/documents/i94_factsheet_2.pdf

67.     Around March 3, 2016, Das received a letter from DDS saying that his previous driver's license had been cancelled.

68.     On or about March 22, 2016, Das visited OIS in person and gave the following documents to a clerk: (1) a copy of his Form I-797C reflecting receipt of his application to adjust status to lawful permanent resident; (2) a printout of his Case Status from the USCIS website,[6] reflecting that the last action by USCIS on his pending application to adjust status was an interview with USCIS in March 2012; (3) a copy of his current EAD; (4) a copy of his Social Security card; and (5) two documents with his name and home address.

69.     A few days later, Das called OIS and asked to speak to Investigator Slater. He was told that Investigator Slater was not available, but that he would call Das back. Das has not heard from Investigator Slater or anyone else at DDS since March 2016.

70.     Das currently lacks a valid Georgia driver's license.

71.     Das meets all the eligibility requirements for a Georgia driver's license. Das would be granted a Georgia driver's license if not for DDS' unlawful policy of determining that a person with a pending application to adjust status is

---

[6] U.S. Citizenship & Immigration Servs., Case Status Online, https://egov.uscis.gov/casestatus/landing.do.

ineligible for a driver's license if he cannot prove continuous authorized presence in the United States prior to filing an application to adjust status.

72.    As a result of DDS' decision to cancel Das's license, Das risks losing his job as a night clerk at a gas station because of transportation difficulties related to not having a driver's license.

73.    As a result of DDS' decision to cancel Das's license, Das has also lost income. Das worked as an Uber driver for approximately three months until his driver's license expired.  Without his license, he has lost this extra income on which his family relied.

74.    DDS' decision to cancel Das's license has also interfered with his religious practice. Before DDS canceled Das's license, he regularly volunteered at a Hindu temple in Atlanta, cooking and serving meals for the community. This type of service is part of his religion and is very important to him. Das no longer volunteers at temple because he cannot drive there.

75.    Plaintiff **Saed Guled** lives in Stone Mountain, Georgia. He owns a small business based in Lilburn, Georgia that sells and installs cabinets for kitchens and bathrooms.

76.    Guled, who is a Canadian citizen, entered the United States from Canada as a visitor in 2006.

25

77.     Guled is married to a U.S. citizen. Guled and his wife have four U.S. citizen children, all under ten years old.

78.     In October 2012, Guled applied to USCIS to adjust his status to lawful permanent resident based on his marriage. His I-485 application for adjustment of status is pending.

79.     Guled has an EAD from USCIS, which allows him to work in the United States from February 12, 2016 to February 11, 2017. Guled's EAD reflects that he is in category (c)(9), indicating that he has a pending I-485 application for adjustment of status.

80.     In previous years, Guled has received EADs from USCIS based on his pending application for adjustment of status. Until this year, Guled has been able to receive a driver's license from DDS after presenting his EAD. Guled's most recent Georgia driver's license expired on February 11, 2016.

81.     On February 12, 2016, Guled applied to renew his driver's license at the DDS office in Lithonia, Georgia. A DDS clerk refused to renew his driver's license, instead giving Guled a letter that stated that his application would need to be reviewed by OIS. The DDS clerk told him that he should call OIS after five to seven business days.

82.     Several days later, when Guled called OIS, a clerk told him to submit to that office all the documents that he had sent to USCIS when he applied to adjust status to lawful permanent resident.

83.     Guled went to the OIS office in Conyers, Georgia, and presented the documents that he had submitted to USCIS when he applied to adjust status to lawful permanent resident. An OIS employee made a copy of these documents.

84.     In or around late February 2016, Investigator Brooks from OIS called Guled and said she needed proof of the date when Guled entered the United States. Guled returned to OIS and showed Investigator Brooks his passport and a document he received from Customs and Border Protection when he entered the United States from Canada in 2006. Investigator Brooks asked him when he got married. When Guled told her, Investigator Brooks said he had overstayed his "visa." She said she would review Guled's application and call him back.

85.     When Investigator Brooks called Guled, she said Guled would not be eligible for a driver's license until he received his green card.

86.     In late February 2016, Guled received a letter from DDS saying that his license had been cancelled, effective as of February 16, 2016.

87.     On March 9, 2016, Guled went to the DDS OIS office in Conyers and gave the following documents to Investigator McClain, because Investigator

Brooks was not in the office: (1) a copy of his Form I-797C, reflecting USCIS' receipt of his application to adjust status to lawful permanent resident; (2) a printout of his Case Status from USCIS, which reflects that the last action that USCIS took on his pending application to adjust status was to schedule an interview for August 8, 2013; (3) a copy of his EAD; (4) a copy of his Social Security card; and (5) two documents showing his name and residential address. Investigator McClain told Guled to call her back in several days.

88.     Several days later, Guled called OIS and asked to speak to Investigator McClain. He was told that Investigator McClain was not in the office that day, but that he should call back the following week and speak to Investigator Brooks.

89.     Guled called OIS and left a message for Investigator Brooks. Guled has not heard back from Investigator Brooks since then.

90.     The office of Georgia Representative Henry C. "Hank" Johnson, Jr. sent an inquiry to DDS about Guled, after Guled complained to Rep. Johnson's office. On March 28, 2016, DDS responded by email to Rep. Johnson's office: "Investigative Services has spoken with this customer and informed the customer that the information provided did not show lawful status."

91.     Guled currently lacks a valid Georgia driver's license.

28

92.     Guled meets all the eligibility requirements for a Georgia driver's license. Guled would be granted a Georgia driver's license if not for DDS' unlawful policy of determining that a person with a pending application to adjust status is ineligible for a driver's license if he cannot prove to DDS' satisfaction that he had continuous authorized presence in the United States prior to filing an application to adjust status.

93.     Guled's monthly income from his cabinet business has decreased notably since he lost his driver's license, and he expects that his income will continue to decrease as long as he does not have a license. Guled's business requires him to drive to prospective clients' houses to discuss the work that the clients are requesting and to provide estimates. Guled lost at least one customer because he was unable to find anyone to drive him to the customer's home at the time the customer requested. Without a driver's license, it is much more difficult for Guled to properly supervise ongoing projects being handled by his company. Guled's inability to drive has also necessitated that he ask an employee to drive him around. In turn, that employee's work has been disrupted and the employee has been unable to meet with potential new clients.

94.    Because he lacks a driver's license, Guled is also unable to transport his children, including to their school, and must rely on his wife to do the family driving.

95.    Plaintiff **Steffani Mowat** lives in Vinings, Georgia and works as a production manager at a marketing company in Atlanta.

96.    Mowat is a Canadian citizen. In October 2015, Mowat applied to adjust her status to lawful permanent resident based on her marriage to a U.S. citizen. Because Mowat was a victim of abuse by her husband, she applied to adjust status under the Violence Against Women Act ("VAWA"), which allows abused spouses of U.S. citizens to petition for adjustment of status by themselves, without the abusive spouse's sponsorship. 8 U.S.C. § 1154(a)(1)(A)(iii) (2016).

97.    Mowat's application for adjustment of status is pending.

98.    Mowat has an EAD from USCIS, which allows her to work in the United States from December 16, 2015 to December 15, 2016. Mowat's EAD reflects that she is in category (c)(9), indicating that she has a pending I-485 application for adjustment of status.

99.    On or around January 25, 2016, Mowat applied online for a driver's license and went to the DDS office in Marietta.  A DDS clerk refused to issue a driver's license, instead giving Mowat a paper that said that her application was

being reviewed by the OIS, and that she should call that office after three business days.

100.   Soon after, Mowat called OIS and spoke to an investigator. The investigator told her to send additional documents to that office. Mowat mailed OIS a copy of her Social Security card, a copy of her EAD, several forms that she received from USCIS, two documents with her name and home address, a copy of her Canadian passport, and a copy of her Ontario, Canada driver's license.

101.   Soon after Mowat sent these documents, Investigator Davis from OIS called Mowat and asked her when she had last entered the U.S. and what visa she had applied for. Mowat asked Investigator Davis to call her immigration lawyer, Edivette Lopez-Benn, and gave her Ms. Lopez-Benn's phone number.

102.   Investigator Davis and Ms. Lopez-Benn spoke soon after, in early February 2016. Investigator Davis asked Ms. Lopez-Benn to send the I-94 Arrival/Departure Record issued to Mowat when she arrived in the United States, as well as the receipts that USCIS issued to Mowat for her immigration petition related to the domestic violence she had suffered, and her I-485 application to adjust status to lawful permanent resident. Ms. Lopez-Benn faxed these documents to Investigator Davis.

31

103.   Later in the month of February 2016, Investigator Davis told Ms. Lopez-Benn that Mowat would not qualify for a license unless she had lawful status during the entire period when she lived in the United States. Investigator Davis asked Ms. Lopez-Benn to provide evidence demonstrating that Mowat had lawful status during that entire period.

104.   On or about March 29, 2016, Mowat went to the OIS office in Conyers and gave the following documents to Investigator Williams: (1) A copy of her Form I-797C, from USCIS, reflecting receipt of her application to adjust status to lawful permanent resident; (2) a printout of her Case Status from USCIS, which reflects that the last action that occurred with respect to her pending application to adjust status was USCIS' receipt of that application on October 20, 2015; (3) a copy of her EAD; (4) a copy of her Social Security card; and (5) two documents showing her name and residential address.

105.   Investigator Williams asked Mowat where her visa was, and she responded that she did not have one. Investigator Williams also asked Mowat whether she entered the United States as a student, and Mowat said no. Investigator Williams said OIS would contact Mowat if the office needed anything else.

106.   Mowat has not heard from Investigator Williams or from anyone else from OIS regarding the documents she presented on March 29, 2016.

107.   Mowat currently lacks a valid Georgia driver's license.

108.   Mowat meets all the eligibility requirements for a Georgia driver's license. Mowat would be granted a Georgia driver's license if not for DDS' unlawful policy of determining that a person with a pending application to adjust status is ineligible for a driver's license if she cannot prove continuous authorized presence in the United States prior to filing an application to adjust status.

109.   Mowat lives in Vinings, about a thirty minutes' drive from her job in downtown Atlanta. Mowat sometimes works long hours, including late into the night, and it would be very difficult for her to rely on public transportation for her commute. Mowat was previously stopped by a police officer while driving, and the officer told her that she could be arrested and sent to prison for driving with her Ontario, Canada license instead of a Georgia license.

110.   Plaintiff **Rosario Juarez Alegria** lives in Calhoun, Georgia and works at a carpet factory. She is a single mother to two U.S. citizen children.

111.   Juarez Alegria is a Mexican citizen. In December 2015, Juarez Alegria applied to adjust her status to lawful permanent resident based on having been present in the United States with a U visa for at least three years.

112.   Juarez Alegria's application for adjustment of status is pending.

33

113.   Juarez Alegria has an EAD from USCIS which allows her to work in the United States from February 3, 2016 to February 2, 2017. Juarez Alegria's EAD reflects that she is in category (c)(9), indicating that she has a pending I-485 application for adjustment of status.

114.   Shortly after she received her U visa in March 2012, Juarez Alegria applied for and was granted a four year driver's license from DDS. That license will expire on April 29, 2016.

115.   In late February 2016, Juarez Alegria went to the DDS office in Calhoun to renew her Georgia driver's license. The DDS representative did not renew her license, instead giving Juarez Alegria a letter that said that her application would need to be reviewed by OIS and that she should call OIS to follow up.

116.   Soon after, Juarez Alegria called OIS. The OIS investigator asked how she entered the United States. Juarez Alegria responded that she entered the United States without authorization and that she has current (c)(9) status.

117.   The OIS investigator then stated that Juarez Alegria could not get a license because she is not in the country legally. When Juarez Alegria offered to have her immigration attorney speak with DDS, the investigator said that there was

nothing that her immigration attorney could do because until Juarez Alegria got her green card, she could not get a license.

118.   About two weeks later, Juarez Alegria went to the DDS office in Dalton, Georgia to again apply to renew her license. She brought her Social Security card, her old EAD, her new EAD, passport, and expiring driver's license. A DDS representative informed Juarez Alegria that DDS would not give her a driver's license until she obtained her green card.

119.   Juarez Alegria meets all the eligibility requirements for a Georgia driver's license. Juarez Alegria would be granted a Georgia driver's license if not for DDS' unlawful policy of determining that a person with a pending application to adjust status is ineligible for a driver's license if she cannot prove continuous authorized presence in the United States prior to filing an application to adjust status.

120.   The imminent expiration of her driver's license poses significant problems for Juarez Alegria. The carpet factory where she works to support herself and her two children is located about 15 miles from her home. Public transportation is not available for this commute.

121.   Without a driver's license, Juarez Alegria cannot lawfully transport her children to and from appointments and school activities, drive to medical

appointments and the grocery store, and run other basic errands essential to her family life.

122.   Plaintiff **Victor Escobedo** lives in Kennesaw, Georgia. He works as a handyman and does remodeling work throughout Georgia and in other states.

123.   Escobedo is a Mexican citizen. He has lived in the United States since 1990.

124.   In 2008, Escobedo was arrested for driving with an expired license. He was subsequently referred to immigration authorities, who asserted that he was here without legal authorization and instituted removal proceedings against him. Escobedo filed a Form EOIR 42B Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents in October 2008. Escobedo's EOIR 42B application is still pending.

125.   Since he filed his EOIR 42B application, Escobedo has received several one-year EADs from USCIS. Escobedo now has an EAD from USCIS which allows him to work in the United States from September 16, 2015 to September 15, 2016. Escobedo's EAD reflects that he is in category (c)(10), indicating that he has a pending application for cancellation of removal and adjustment of status.

126.    Escobedo has received Georgia driver's licenses in previous years. His most recent Georgia driver's license expired in July 2014. Escobedo obtained that license from DDS after presenting his EAD, his Social Security card, and documents showing his Georgia residency.

127.    On or around February 2, 2016, Escobedo applied for a driver's license at the DDS office in Kennesaw. He presented his EAD, passport, Social Security card, and documents showing his Georgia residency. A DDS clerk refused to issue a license, instead giving Escobedo a paper that stated that his application needed to be reviewed by OIS, and that he should call that office.

128.    Soon after, Escobedo called OIS and spoke to Investigator Heard. Investigator Heard asked him to fax or bring to OIS all the immigration documents that Escobedo has. Escobedo then brought the following documents to OIS: his EAD, his Social Security card, his Mexican passport, and several documents that he had received from USCIS, including the Form I-797C reflecting receipt by USCIS of his application for cancellation of removal and adjustment of status. A woman at OIS made copies of these documents.

129.    Soon after, Investigator Heard called Escobedo and said that he was reviewing Escobedo's documents.

130.   On or around February 15, 2016, Escobedo went to the DDS office in Cartersville, Georgia to again attempt to renew his license. He was given a paper notifying him that his license had been suspended, and that he should call OIS.

131.   Escobedo called OIS and spoke to Investigator Heard. Investigator Heard told Escobedo that he is not eligible for a driver's license because — according to DDS — he does not have lawful status in the United States. Investigator Heard said Escobedo will not be eligible for a driver's license until he receives his green card.

132.   Escobedo received in the mail a letter from DDS notifying him that his driver's license has been cancelled as of February 15, 2016.

133.   Escobedo currently lacks a valid Georgia driver's license.

134.   Escobedo meets all the eligibility requirements for a Georgia driver's license. Escobedo would be granted a Georgia driver's license if not for DDS' unlawful policy of determining that a person with a pending application for cancelation of removal and adjustment of status is ineligible for a driver's license if he cannot prove continuous authorized presence in the United States prior to filing an application for cancellation of removal and adjustment of status.

135.   Escobedo's work requires him to drive. He is self-employed and performs work at his customers' homes and businesses throughout Georgia and in

38

other states, including Alabama, Tennessee and Florida. His work involves painting, roofing, and pressure washing, among other tasks, and he needs to drive a truck to transport his tools, which include large ladders. His most recent job required him to travel 90 miles from his home.

136.   Escobedo's wife and three U.S. citizen children depend on his income to survive.

137.   Plaintiff **Jorge Rosillo Zaragoza** lives in Forest Park, Georgia. He is a construction worker for a roadbuilding company.

138.   Rosillo Zaragoza is a Mexican citizen. He has lived in the United States since 1995.

139.   In 2012, Rosillo Zaragoza was arrested for driving without a valid license. He was subsequently referred to immigration authorities, who asserted that he was here without legal authorization and instituted removal proceedings against him. In September 2013, Rosillo Zaragoza filed a Form EOIR 42B Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents. Rosillo Zaragoza's EOIR 42B application is still pending.

140.   Since he filed his EOIR 42B application, Rosillo Zaragoza has received several one-year EADs from USCIS. Rosillo Zaragoza currently has an EAD issued by USCIS which allows him to work in the United States from

November 26, 2015 to November 25, 2016. Rosillo Zaragoza's EAD reflects that he is in category (c)(10), indicating that he has a pending application for cancellation of removal and adjustment of status.

141.   Rosillo Zaragoza has received Georgia driver's licenses in previous years. In November 2013, he received a one-year license from DDS after presenting his EAD, Social Security card, and passport. In November 2014, he received another one-year license from DDS after presenting the same documents. His most recent driver's license expired in November 2015.

142.   In early December 2015, Rosillo Zaragoza went to the DDS office in Hampton, Georgia to renew his license. He presented his EAD, his Social Security card, and his passport. A DDS clerk refused to issue him a license, instead giving Rosillo Zaragoza a paper that stated that his application needed to be reviewed by OIS, and that he should call that office.

143.   Soon after, Rosillo Zaragoza called OIS and spoke to an OIS employee. The employee told him that he will not be eligible for a license until his application to adjust status to lawful permanent resident is approved.

144.   Rosillo Zaragoza currently lacks a valid Georgia driver's license.

145.   Rosillo Zaragoza meets all the eligibility requirements for a Georgia driver's license. Rosillo Zaragoza would be granted a Georgia driver's license if

not for DDS' unlawful policy of determining that a person with a pending application for cancelation of removal and adjustment of status is ineligible for a driver's license if he cannot prove continuous authorized presence in the United States prior to filing an application for cancellation of removal and adjustment of status.

146.   Rosillo Zaragoza's work requires him to drive. He does construction work for a roadbuilding company, and he must travel to worksites throughout Georgia and sometimes in Alabama. His current worksite is in Marietta, Georgia, which is a 45 drive from his house without traffic. Public transportation is not available for this commute. Rosillo Zaragoza needs to work to support himself and to help support his son and daughter.

147.   Rosillo Zaragoza is separated from his children's mother, but he remains significantly involved in his children's lives. His children live with their mother about 15 miles from Rosillo Zaragoza's home, and he is accustomed to visiting them every weekend. Public transportation is not available for this trip.

148.   Rosillo Zaragoza's daughter is blind, and she sometimes needs him to drive her home from work or school when she leaves late at night. She also needs him to drive her to medical appointments and to pick up prescriptions. Her mother does not have a driver's license and is not eligible for one.

149.   On or about March 27, 2016, Rosillo Zaragoza received a summons for driving without a valid Georgia license, in violation of Ga. Code Ann. § 40-5-20. Rosillo Zaragoza paid a $550 fine, which is approximately one week's income for him. He is scheduled to appear in court on this charge in May 2016.

## CLASS ACTION ALLEGATIONS

150.   Plaintiffs bring this action on behalf of themselves and all those similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1)(A) and 23(b)(2).

151.   The class is defined as:

All individuals classified by federal law pursuant to 8 C.F.R. § 274a.12(c)(9) or (c)(10): (1) who have currently pending applications to adjust status to lawful permanent resident and (2) to whom DDS is refusing to issue or will refuse to issue driver's licenses as a result of its policy requiring such applicants to prove authorized entry and continuous authorized presence in the United States prior to applying for adjustment of status.

152.   The precise size of the class is unknown, but it likely encompasses well over a thousand people. Recent USCIS statistics indicate nearly 6,000 applications to adjust status pending in USCIS' Atlanta field office, which serves persons residing in most counties in Georgia (including metro Atlanta), as well as Alabama.

153.   Questions of law and fact are common to the class, including (1) whether Defendant's policy violates the Equal Protection Clause by discriminating between groups of non-citizens whom federal law regards as having "lawful status" for the purpose of establishing eligibility for driver's licenses; and (2) whether Defendant's policy is preempted because it directs state officials to make immigration classifications independent from those recognized by the federal government and inconsistent with federal law.

154.   Plaintiffs' claims are typical of the claims of the class. Defendant has a policy of refusing to issue driver's licenses to people with pending applications for adjustment of status when such individuals are unable to show to DDS' satisfaction that they had authorized presence for all periods in which they were physically present in the United States. This policy applies with equal force to all members of the proposed class.

155.   Plaintiffs will fairly and adequately represent the interests of all members of the proposed class because they seek relief on behalf of the class as a whole and have no interests antagonistic to other members of the class. Plaintiffs, like members of the proposed class, cannot obtain driver's licenses as a result of Defendant's unlawful policy and seek to have that policy declared unlawful so that Plaintiffs and class members will receive the driver's licenses for which they are

eligible under federal and state law.

156.    Plaintiffs are also fairly and adequately represented by their counsel. The Southern Poverty Law Center specializes in civil rights litigation and has substantial expertise in class action litigation and litigation to vindicate the civil rights of immigrants. The Law Offices of Justin W. Chaney, LLC specializes in immigration law, and has substantial experience representing individual non-citizens in challenging DDS' refusal to issue driver's licenses.

157.    Under state law, if any person believes that DDS is wrongfully refusing to grant her a driver's license, she has a right to seek review of that decision in the superior court for the County in which she resides. *See* Ga. Code Ann. § 40-5-66(a). Prosecution of separate actions by aggrieved class members within various jurisdictions throughout Georgia thus creates a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant in the future.

158.    Defendant has acted and will act on grounds generally applicable to the class in creating and implementing the uniform policy of denying driver's licenses to people with pending applications for adjustment of status as a result of DDS' determination that such individuals cannot demonstrate continuous authorized presence prior to filing for adjustment of status. Therefore, final relief

declaring this policy unlawful and enjoining its enforcement is appropriate with respect to the class as a whole.

## CAUSES OF ACTION

### COUNT ONE

### FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE; 42 U.S.C. § 1983

159.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

160.   Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

161.   The Fourteenth Amendment to the United States Constitution provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

162.   Defendant has and enforces a policy of denying driver's licenses to non-citizens who have currently pending applications for adjustment of status where such persons cannot prove to DDS that the entirety of their past presence in the United States was authorized.

163.   During all relevant times, including in the promulgation and enforcement of this policy, Defendant has acted under color of state law.

164.   Defendant's policy impermissibly discriminates against Plaintiffs and class members — all of whom are currently authorized by the federal government to stay and work in the United States — on the basis of their alienage.

165.   Defendant's policy impermissibly discriminates between Plaintiffs and other categories of non-citizens, such as deferred action recipients, who are issued driver's licenses in Georgia even if they are unable to prove prior continuous authorized presence.

166.   Defendant's policy also impermissibly discriminates between non-citizens who are classified identically under federal law.

167.   Defendant's policy denies Plaintiffs and class members equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution.


## COUNT TWO

### CLAIM FOR EQUITABLE RELIEF TO ENFORCE THE SUPREMACY CLAUSE AND ENJOIN STATE ACTION PREEMPTED BY FEDERAL IMMIGRATION LAW

168.   The foregoing allegations are repeated and incorporated as though

fully set forth herein.

169.   The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.

170.   The Supremacy Clause mandates that federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority, or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law. The Supremacy Clause also forbids states from regulating immigration or creating immigration classifications independently from those created by the federal government.

171.   Defendant's policy treats certain non-citizens with pending applications for adjustment of status as ineligible for a driver's license based on DDS officials' determination that these non-citizens cannot prove their prior presence in the United States was continuously authorized.

172.   By instructing DDS staff to examine a non-citizen's past, rather than current status, Defendant's policy usurps the exclusive authority of the federal

government to determine an individual's immigration status and directs state officials to make immigration determinations independently from those recognized by the federal government.

173.   Defendant's policy of distinguishing between persons with pending adjustment of status applications based on inability to prove past continuous authorized presence creates immigration categories that are inconsistent with and unrecognized by federal law. By intruding on the federal government's exclusive authority to make immigration status classifications, Defendant's policy conflicts with federal statutes, regulations and policies, usurps powers constitutionally vested in the federal government, and attempts to legislate in fields occupied by the federal government, in violation of the Supremacy Clause.

174.   Plaintiffs move for relief on this claim pursuant to the court's equitable authority to enjoin state action that violates the Supremacy Clause.

## **PRAYER FOR RELIEF**

WHEREFORE, in light of the foregoing, Plaintiffs request that the Court:

a.   Assume jurisdiction over this matter;

b.   Certify this matter as a class action pursuant to Rules 23(a) and 23(b)(1)(A) and (b)(2) of the Federal Rules of Civil Procedure;

c.  Appoint counsel as class counsel pursuant to Rule 23(g);

d.  Declare that DDS' policy of refusing to issue driver's licenses to people currently classified by the federal government according to 8 C.F.R. § 274a.12(c)(9) or (c)(10), based on DDS' determination that such persons cannot prove continuous prior authorized presence, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

e.  Declare that DDS' policy of refusing to issue driver's licenses to people classified by the federal government according to 8 C.F.R. § 274a.12(c)(9) or (c)(10), based on DDS' determination that such persons cannot prove continuous prior authorized presence, violates the Supremacy Clause of the United States Constitution and is preempted by federal law;

f.  Issue a preliminary injunction, later to be made permanent, enjoining Defendant from directing or allowing state officials to deny driver's licenses to individuals with pending applications for adjustment of status on the sole basis that such individuals cannot demonstrate that their presence in the United States was continuously authorized prior to applying to adjust status;

g.  Issue a preliminary injunction, later to be made permanent, enjoining Defendant from requiring individuals with currently pending applications for adjustment of status who are otherwise eligible for a Georgia driver's license to provide proof of continuous prior authorized presence in order to receive a license;

h.  Grant Plaintiffs their reasonable costs of suit and reasonable attorneys' fees and other expenses pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and as otherwise permitted by law.

i.  Grant such other relief as this Court may deem just and proper.

Respectfully submitted this 27th day of April, 2016,[7]

  /s/ Gillian Gillers
Gillian Gillers (GA Bar No. 311522)
Kristi L. Graunke (GA Bar No. 305653)
Naomi R. Tsu (GA Bar No. 507612)
SOUTHERN POVERTY LAW CENTER
1989 College Avenue NE
Atlanta, GA 30317
Tel: (404) 521-6700
Fax: (404) 221-5857
gillian.gillers@splcenter.org
kristi.graunke@splcenter.org
naomi.tsu@splcenter.org

---

[7] Counsel certifies that this document has been prepared in Times New Roman font and 14 point, in accordance with LR 5.1, NDGa.

Justin W. Chaney (GA Bar No. 120681)
Law Offices of Justin W. Chaney, LLC
1801 Peachtree St. NW, Suite 110
Atlanta, GA 30309
Tel: (404) 475-1616
Fax: (678) 686-8473
jchaney@lawchaney.com