IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

NIL GOVIND DAS, *et al.*, on behalf of
themselves and others similarly
situated,

      Plaintiffs,

v.

BERT BRANTLEY, in his official
capacity as Commissioner of the
Georgia Department of Driver
Services,

      Defendant.

Civil Action No. 1:16-cv-1367-LMM

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiffs are non-citizens residing in Georgia who have applications for lawful permanent residency pending with the federal government and current federal authorization to live and work in the United States. Plaintiffs have sued Defendant Bert Brantley in his official capacity to enjoin a recent policy by the Georgia Department of Driver Services (DDS) under which DDS has refused to grant driver's licenses to Plaintiffs and other similarly situated non-citizens. Defendant's Motion to Dismiss (Doc. 9) should be denied in its entirety. While

DDS has issued temporary licenses to Plaintiffs on the heels of Plaintiffs' filing of motions for a preliminary injunction and class certification, Plaintiffs' individual and class claims are not moot. In this case, Plaintiffs seek not merely licenses for themselves, but the termination of a policy that directs DDS officials to investigate the past immigration status of a driver's license applicant with a pending application for adjustment of status and to deny that applicant a license if he is unable to prove continuous prior authorized presence. DDS has not unambiguously terminated the policy at issue in this case, and Plaintiffs will again be subject to that policy when they seek to renew their current temporary licenses. Plaintiffs have also adequately pleaded their preemption and Equal Protection Clause claims.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the complaint's factual allegations are assumed true and construed in the light most favorable to the plaintiff. *Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006). A complaint must state "a plausible claim for relief," and "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Factual attacks on jurisdiction, such as the mootness argument that Defendant raises here, challenge "the existence

of subject matter jurisdiction in fact, irrespective of the pleadings." *McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). In considering a factual attack on jurisdiction, the Court may consider "matters outside the pleadings, such as testimony and affidavits."[1] *Id.*

## ARGUMENT

### I.   Plaintiffs' Claims Are Not Moot Because DDS Has Not Unambiguously Terminated the Challenged Policy.

A. DDS Has Not Terminated the Policy Challenged in this Case.

Because DDS has not terminated the policy challenged in this case, Plaintiffs have not obtained all the relief they seek and their claims are not moot. "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party. [A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox v. Serv. Emps. Int'l Union*, 132 S. Ct. 2277, 2287 (2012) (internal quotation omitted). In this case, Plaintiffs are seeking to enjoin Defendant's policy of

---

[1] It is clear from the Complaint and the parties' briefs and exhibits that Plaintiffs' claims are not moot. If the Court deems the record insufficient to determine mootness at this stage, however, Plaintiffs should be permitted to conduct discovery related to Defendant's assertions of mootness. *See Douglas v. United States*, 814 F.3d 1268, 1274–75 (11th Cir. 2016) ("[I]n a *factual challenge* the district court *must* give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss.").

directing or allowing state officials to deny driver's licenses to individuals with pending applications for adjustment of status on the sole basis that such individuals cannot demonstrate that their presence in the United States was continuously authorized prior to applying to adjust status. Doc. 1 (Compl.) (Prayer for Relief). DDS has not rescinded this policy, and therefore its post-suit decision to issue temporary licenses to Plaintiffs does not moot the claims of Plaintiffs or the class.

Indeed, in his motion to dismiss, Defendant continues to advocate for an erroneous interpretation of federal law that requires non-citizens to be "lawfully admitted" to the United States to be eligible for a REAL ID-compliant driver's license. Doc. 9-1 (Br. in Supp. of Mot. to Dismiss) at 9 (arguing that "6 C.F.R. § 37.3 states that licenses should only be issued to those 'lawfully admitted'"). Contrary to Defendant's assertion, both the REAL ID Act and 6 C.F.R. § 37.3, which implements that Act, categorize *all* non-citizens with pending applications for lawful permanent residence as having "lawful status" for the purpose of demonstrating eligibility for a driver's license, without regard to the manner in which they entered the United States. *See* 6 C.F.R. § 37.3; Pub. L. No. 109-13, § 202(c)(2)(B)(ix), 119 Stat. 231, 313 (codified at 49 U.S.C. § 30301 note).[2]

---

[2] Defendant's refusal to acknowledge Plaintiffs' current "lawful status" is further evinced by his characterization of Plaintiffs as "alleg[ing] to be illegal immigrants." Doc. 9-1 at 2. Aside from the fact that this term has never been

The supporting affidavit signed by Angelique McClendon, DDS' General Counsel, also demonstrates that DDS is not actually rescinding the policy challenged in this case. *See* Doc. 9-2. Ms. McClendon states that non-citizens whose "lawful status" has been verified and who present evidence from the Department of Homeland Security of a pending application for adjustment of status will be considered eligible for driver's licenses and have their documents reviewed on a "case-by-case basis." *Id.* As discussed above, Defendant continues to interpret the term "lawful status" under the REAL ID Act very differently from Plaintiffs, so Ms. McClendon's statement does not demonstrate a departure from the policy challenged in this case. Moreover, Ms. McClendon fails to address the actual policy that Plaintiffs challenge—namely, that DDS officials are investigating such applicants' *past* immigration status and withholding licenses if an applicant is unable to prove continuous past authorized presence.

Ms. McClendon's declaration echoes the position she took prior to the filing of this case, as expressed in her testimony in a state court lawsuit challenging DDS' denial of a license to a non-citizen with a pending application for adjustment of status. In that case, Ms. McClendon testified that DDS does not categorically

---

"alleg[ed]" or used by Plaintiffs in any filing with the Court, it is also inaccurate. All Plaintiffs are currently authorized to work and live in the United States and are seeking *lawful* permanent residency. Doc. 1 ¶¶ 11, 15, 19, 22, 25, 26, 30, 31.

deny licenses to applicants with pending applications for adjustment of status, but instead makes case-by-case inquiries as to whether such applicants were "lawfully admitted" and had valid visas prior to submitting their applications to adjust status. Doc. 5-12 (Angelique McClendon testimony in *Villegas-Torres v. Mikell*, No. 2016-cv-1213-I, Ga. Super. Ct., Mar. 2, 2016); Doc. 5-16 (Order in *Ochoa Chavez v. Mikell*, No. 2015-cv-267634 (Ga. Super. Ct. Apr. 19, 2016)) (describing Ms. McClendon's testimony that DDS requires that a driver's license applicant "must have been lawfully admitted if they have a pending application for adjustment of status, and that the applicant's visa cannot have expired prior to filing the application" to adjust status).

Defendant's requirements of "lawful admission" and non-expiration of a prior visa exemplify the DDS policy that Plaintiffs challenge in this case. Ms. McClendon's refusal to disavow the specific policy at issue, coupled with Defendant's reiteration of that policy in his brief, indicates that DDS continues to interpret federal law to preclude individuals from receiving licenses if their entry to or prior presence in the United States was at any point unauthorized.

B. Any Purported Change in Policy is Not Unambiguous

Even if DDS has changed its policy, which Plaintiffs dispute, this lawsuit is not moot because Defendant has failed to meet his burden of showing that any

policy change is unambiguous. "A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 174 (2000). "Otherwise, a party could moot a challenge to a practice simply by changing the practice during the course of the lawsuit, and then reinstate the practice as soon as the litigation was brought to a close." *Jews for Jesus, Inc. v. Hillsborough Cty. Aviation Auth.*, 162 F.3d 627, 629 (11th Cir. 1998). Thus the Supreme Court has held that "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190. The Eleventh Circuit "employs this standard, even for governmental actors." *Doe v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014).

This circuit also applies a "'rebuttable presumption' in favor of governmental actors, so that 'a challenge to a government policy that has been *unambiguously terminated* will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated.'" *Harrell v. The Florida Bar*, 608 F.3d 1241, 1266 (11th Cir. 2010) (quoting *Troiano v. Supervisor of Elections in Palm Beach Cty.*, 382 F.3d 1276, 1283-85 (11th Cir. 2004) (emphasis added in *Harrell*)). "[T]he government actor is entitled to this

7

presumption only *after* it has shown unambiguous termination of the complained of activity." *Wooten*, 747 F.3d at 1322. If unambiguous termination is established, then this presumption may be rebutted by showing "some reasonable basis to believe that the policy will be reinstated if the suit is terminated." *Harrell*, 608 F.3d at 1266.

The Eleventh Circuit has identified several overlapping factors relevant to "both the initial inquiry of unambiguous termination as well as the following evaluation about whether there is a reasonable basis the challenged conduct will recur." *Wooten*, 747 F.3d at 1322–23. These factors include:

> (1) "whether the termination of the offending conduct was unambiguous;" (2) "whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction;" and (3) "whether the government has consistently applied a new policy or adhered to a new course of conduct."

*Id.* at 1323 (quoting *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 531–32 (11th Cir. 2013)). "The timing and content of the cessation decision are also relevant in evaluating whether the defendant's stopping of the challenged conduct is sufficiently unambiguous." *Id*. The Eleventh Circuit also considers whether "the challenged behavior constituted a continuing practice or was otherwise deliberate." *Id*. (internal quotation omitted). "These factors are not exhaustive and the analysis may vary depending on the facts and circumstances of a particular case." *Id*. Given

DDS' statements prior to and during this litigation and the circumstances surrounding its sudden issuance of licenses to Plaintiffs, it is clear that DDS has not carried its "heavy" burden of demonstrating that it has unambiguously terminated the challenged policy. *Id.*

    1.  *Defendant Is Effectively Reaffirming His Policy*

As Plaintiffs have explained above, at no point has Defendant conceded the illegality of DDS' policy or explicitly rescinded it. Rather, Defendant effectively reaffirms his commitment to the challenged policy in his Motion, by stating that he interprets the REAL ID Act to mandate that only "lawfully admitted" individuals are eligible for licenses. Doc. 9-1 at 9. Plaintiffs are challenging this erroneous interpretation of federal law, as manifested in DDS' policy of investigating applicants' past immigration status and refusing to issue licenses to those who cannot prove continuous past authorized presence. *See* Doc. 1 ¶¶ 2, 56-57, 162, 171. Defendant evades addressing the legality of DDS' policy by asserting that because Plaintiffs have received driver's licenses, they "have obtained the relief sought." Doc. 9-1 at 3. Defendant's refusal to explicitly acknowledge the policy at issue, coupled with his effective reaffirmance of this policy and failure to formally adopt a new policy, weigh heavily against a finding of unambiguous termination. *See Jager v. Douglas Cty. Sch. Dist.*, 862 F.2d 824, 833-34 (11th Cir. 1989)

(rejecting mootness argument where no new "formal policy" was adopted and "defendants never promised not to resume the prior practice"); *see also Rich*, 716 F.3d at 532 (no unambiguous termination in part because defendant "continue[d] to press on appeal that the voluntarily ceased conduct should be declared constitutional"); *Harrell*, 608 F.3d at 1266–67 ("Short of repealing a statute, if a governmental entity decides in a clandestine or irregular manner to cease a challenged behavior, it can hardly be said that its 'termination' of the behavior is unambiguous.").[3]

2. *The Timing and Substance of DDS' Actions Create Substantial Ambiguity*

The timing and substance of DDS' recent statements and conduct make clear that DDS has not unambiguously terminated the challenged policy. The circumstances reflect that any claimed change in policy is not the product of substantial deliberation, but is instead an attempt to defeat this Court's jurisdiction. *See Wooten,* 747 F.3d at 1323. Before filing this lawsuit, Plaintiffs had spent months trying to obtain licenses without success, visiting and communicating with

_____

[3] Even if Defendant promised to terminate the challenged policy and not to reinstate it, that promise alone does not establish mootness. *See Atheists of Fla., Inc. v. City of Lakeland, Fla.*, 713 F.3d 577, 594 (11th Cir. 2013) ("A defendant's assertion that it has no intention of reinstating the challenged practice does not suffice to make a case moot and is but one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts." (internal quotation omitted)).

DDS officials at multiple offices. Doc. 1 ¶¶ 63–69, 81–90, 99–106, 115–118, 127–131, 142–43. Plaintiffs' counsel had written to Ms. McClendon on February 17, 2016, alerting DDS to the constitutional problems with DDS' policy, yet Defendant continued to deny licenses to Plaintiffs and similarly situated individuals. Ex. 24 (SPLC Letter to DDS, Feb. 17, 2016).

Less than three weeks after Plaintiffs filed their Complaint and less than two weeks after Plaintiffs filed their motion for a preliminary injunction, DDS issued temporary licenses to four of the six named Plaintiffs. Ex. 18 (Das 2d. Decl.) ¶¶ 3, 4; Ex. 19 (Guled 2d. Decl.) ¶¶ 2, 3; Ex. 20 (Mowat 2d. Decl.) ¶¶ 2, 3; Ex. 22 (Escobedo 2d. Decl.) ¶¶ 2, 3.[4] DDS issued temporary licenses to the remaining two Plaintiffs within the following week. Ex. 21 (Juarez Alegria 2d. Decl.) ¶¶ 2–4; Ex. 23 (Rosillo Zaragoza 2d. Decl.) ¶¶ 2–4. The timing of DDS' decision to issue licenses to Plaintiffs indicates that Defendant is attempting to avoid federal jurisdiction and has not unambiguously changed the challenged policy. *See Harrell*, 608 F.3d at 1267 (challenged conduct was not unambiguously terminated in part because the defendant changed course "only . . . after this litigation had

---

[4] The supplemental plaintiff declarations submitted with this response—to which copies of Plaintiffs' newly-issued licenses are attached—are numbered consecutively beginning with Exhibit 18 to avoid confusion with Exhibits 1–17, which were attached to Plaintiffs' motions for a preliminary injunction and for class certification.

commenced"); *Jager*, 862 F.2d at 833 (case was not moot where defendant ceased the challenged conduct "[u]nder the imminent threat of the Jagers' lawsuit").

In examining a cessation decision, the Eleventh Circuit "look[s] for a well-reasoned justification for the cessation as evidence that the ceasing party intends to hold steady in its revised (and presumably unobjectionable) course." *Harrell*, 608 F.3d at 1266 (challenged conduct was not unambiguously terminated where defendant "acted in secrecy" and "fail[ed] to disclose any basis for its decision"); *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Georgia*, 633 F.3d 1297, 1312 (11th Cir. 2011) (no unambiguous termination where "neither counsel provided any reasoned basis for voluntarily ceasing the infringing conduct"). As stated above, Defendant has not explicitly rescinded the challenged policy, much less explained his reasoning for any changes made. Defendant has also provided no explanation for DDS' recent decision to grant licenses to the named Plaintiffs, when DDS previously had denied licenses to these Plaintiffs and told most of them that they would be ineligible for licenses until they obtained green cards. Doc. 1 ¶¶ 63–69, 81–90, 99–106, 115–118, 127– 131, 142–43. Defendant's lack of transparency reflects a significant risk that DDS will continue to enforce the challenged policy against individuals other than the Plaintiffs at present and against Plaintiffs and class members in the future. *See Harrell*, 608

F.3d at 1267 (rejecting mootness argument because defendant's "opaque decision fairly leaves open the possibility that" the defendant believed its rule was legal but "has decided that it will not enforce the rule against [plaintiff] in this case"); *ACLU v. The Florida Bar*, 999 F.2d 1486, 1494–95 (11th Cir. 1993) (rejecting mootness argument where defendant had agreed that it would not enforce the rule against the plaintiff in a particular instance, but maintained that the challenged rule was constitutional and applied to the plaintiff's activities).

3.   *DDS' Repeated Denials of Licenses to Plaintiffs and Class Members and its Vigorous Defense of its Policy Weigh Against Mootness*

Defendant's consistent prior enforcement and defense of its policy further weigh against a mootness finding. In recent state court challenges by individuals denied licenses, Defendant has repeatedly argued for its erroneous interpretation of the REAL ID Act and its right to deny driver's licenses to applicants who could not prove continuous lawful presence. *See, e.g.*, Doc. 5-11 (DDS Brief Filed in *Ochoa-Chavez v. Mikell*, No. 2015-cv-267634 (Ga. Super. Ct. Mar. 31, 2016)); Doc. 5-12 (McClendon Testimony) at 52–54. Before filing a lawsuit, Plaintiffs repeatedly tried to obtain licenses, but were turned down on the grounds that they lacked "lawful status" because they could not prove to DDS' satisfaction that they were continuously in the United States with authorization prior applying for adjustment of status. Doc. 1 ¶¶ 63–69, 81–90, 99–106, 115–118, 127–132, 142–143; Doc. 5-3

¶¶ 7–14; Doc. 5-4 ¶¶ 8–19; Doc. 5-5 ¶¶ 7–12; Doc. 5-6 ¶¶ 8–10; Doc. 5-7 ¶¶ 10–15; Doc. 5-8 ¶¶ 10–11; Doc. 5-14 ¶¶ 5–10. That Defendant has repeatedly defended and enforced the challenged policy weighs against a mootness finding. *See Wooten*, 747 F.3d at 1324 (holding that defendant did not unambiguously terminate the challenged practice of transferring plaintiff to high-security prison facilities, and considering as relevant to that analysis "the fact that [plaintiff] has been transferred repeatedly over a period of years"); *Atheists of Fla., Inc.*, 713 F.3d at 594 ("[W]e are more likely to find a reasonable expectation of recurrence when the challenged behavior constituted a continuing practice or was otherwise deliberate." (internal quotation omitted)).

To the extent that Defendant claims to have rescinded the challenged policy –a claim it has yet to make— it has not shown that it has consistently adhered to a new course of conduct. *See Nat'l Ass'n of Bds. of Pharmacy*, 633 F.3d at 1312 (challenged conduct was not unambiguously terminated in part because "the record is not clear with respect to whether [defendants] have consistently adhered to their professed cessation," notwithstanding defendants' assurances to that effect).

In light of Defendant's conduct and statements prior to and during this litigation and the circumstances surrounding DDS' issuance of licenses to Plaintiffs, Defendant has not carried his heavy burden of demonstrating that DDS

14

unambiguously terminated the challenged policy. Accordingly, Plaintiffs' claims are not moot.[5]

C. <u>The Grant of Temporary Licenses to Named Plaintiffs Does Not Moot Their Claims</u>

In light of DDS' refusal to unambiguously terminate its policy, DDS' post-suit issuance of driver's licenses to Plaintiffs does not moot their individual claims, and they remain appropriate class representatives. The expiration dates on Plaintiffs' current licenses range from September 15, 2016 to February 14, 2017. Ex. 18 ¶ 5; Ex. 19 ¶ 4; Ex. 20 ¶ 4; Ex. 21 ¶ 5; Ex. 22 ¶ 5; Ex. 23 ¶ 5.[6] If DDS' policy is not rescinded or enjoined before Plaintiffs' licenses expire beginning in three months, Plaintiffs will encounter the same obstacles as before, and will be unable to renew their licenses. Plaintiffs' individual claims are therefore ongoing and not moot. *See Wooten*, 747 F.3d at 1324 (prisoner's assignment to a state

---

[5] In related litigation before the Court, Defendant's immediate predecessor at DDS has also sought to avoid this Court's jurisdiction by issuing vague policy statements in response to litigation, but refusing to acknowledge former policies or specifically explain and justify its "new" policies. *See* Defendant Mikell's Pre-Answer Motion to Dismiss at 3,7, *Doe v. Mikell*, 1:15-cv-3060 (N.D. Ga. Feb. 16, 2016) (arguing that a lawsuit challenging the denial of driver's licenses to certain non-citizens was moot because DDS had recently issued a new policy requiring certain applications to be reviewed by its Office of Investigative Services, without explaining how such review would cure the alleged constitutional violations).

[6] Several days before receiving their current licenses, Plaintiffs were initially provided "special issuance" licenses that were only valid for a few weeks. Ex. 18 ¶¶ 3–4; Ex. 19 ¶¶ 2–3; Ex. 20 ¶¶ 2–3; Ex. 21¶ 4; Ex. 22 ¶ 3; Ex. 23 ¶ 4.

facility did not moot his lawsuit seeking an injunction against future transfers to high-security federal facilities, given that the prisoner's "assignment to a state facility is not permanent and is subject to review every two years").

Even if Plaintiffs' individual claims were moot, the class claims asserted by Plaintiffs would not be moot because Plaintiffs acted diligently to pursue the class claims. In the Eleventh Circuit, where plaintiffs file a putative class action and "act[] diligently to pursue the class claims," the mooting of the named plaintiffs' claims through purposive acts by the defendant does not moot the lawsuit. *Stein v. Buccaneers Ltd. P'ship*, 772 F.3d 698, 706–707 (11th Cir. 2014). Rather, "the class claims remain live, and the named plaintiffs retain the ability to pursue them." *Id.* at 704. Diligence requires only that the named plaintiff "diligently takes any necessary discovery, complies with any applicable local rules and scheduling orders, and acts without undue delay." *Id.* at 707. Plaintiffs here diligently pursued their claims, filing a motion for class certification well before the deadline set in Local Rule 23.1(B). *See* Doc. 8 (Class Cert. Mot. filed May 16, 2016). Regardless of any individual mootness, Plaintiffs retain the ability to pursue the class claims.

## II.      Plaintiffs Have Properly Stated a Preemption Claim

Plaintiffs' Complaint adequately states a claim for injunctive relief "pursuant to the court's equitable authority to enjoin state action that violates the Supremacy

Clause." Doc. 1 ¶ 174.[7] *See Armstrong v. Exceptional Child Center, Inc.*, 135 S.

Ct. 1378, 1384 (2015) ("[W]e have long held that federal courts may in some

circumstances grant injunctive relief against state officers who are violating, or

planning to violate, federal law. . . . The ability to sue to enjoin unconstitutional

actions by state and federal officers is the creation of courts of equity."); *Exodus*

*Refugee Immigration, Inc. v. Pence*, – F.Supp.3d – , 2016 WL 772897, at *5 (S.D.

Ind. 2016) (holding that after *Armstrong*, courts may exercise equitable power to

enjoin state action that is preempted by federal immigration law).

        Plaintiffs' factual allegations, which the Court must accept as true in

considering a motion to dismiss for failure to state a claim, plausibly allege a DDS

policy that denies driver's licenses to non-citizens with pending applications for

adjustment of status based solely on DDS' determination that they lack "lawful

status" because they cannot demonstrate continuous prior authorized presence in

the United States.  Doc. 1 ¶¶ 57, 63–71, 81–92, 99–108, 115–119, 127–134, 142–

145. That policy violates the Supremacy Clause because it directs state officials to

investigate and determine individuals' past immigration status instead of focusing

solely on their current federally authorized status, thus encroaching on the federal

---

[7] Contrary to Defendant's assertion, Plaintiffs do *not* allege a cause of action under
42 U.S.C. § 1983 for violation of the Supremacy Clause, but instead pursuant to
this Court's equitable authority, as set out in *Armstrong*.

government's exclusive authority to make immigration classifications and determine immigration status. *Id.* ¶¶ 168–174; *Plyler v. Doe*, 457 U.S. 202, 225 (1982) ("The States enjoy no power with respect to the classification of aliens. . . . This power is 'committed to the political branches of the Federal Government.'" (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)).

Defendant inaccurately claims that Plaintiffs are alleging that DDS' policy is preempted by the REAL ID Act. Because states may elect to comply with the REAL ID Act, Defendant contends, it cannot preempt state law. Defendant cites *Saldana v. Lahm*, No. 4:13-cv-3108, 2013 WL 5658233 (D. Neb. Oct. 11, 2013), in which the district court dismissed a preemption claim based on argument that the REAL ID Act preempted state law. *Saldana* is inapposite because Plaintiffs' preemption claim is based on the exclusive federal power to classify immigrants, and not on an argument that the REAL ID Act serves as an independent basis for preemption.[8] Doc. 1 ¶¶ 170–73. Plaintiffs allege that DDS policy creates a state definition of "lawful status," with no analogue in federal law, that requires Plaintiffs and other similarly-situated individuals to prove to DDS' satisfaction that

---

[8] Plaintiffs do note, however, that the Eleventh Circuit has described the Real ID Act as "contemplating" that persons who have "lawful status" under that Act will be eligible for REAL ID licenses. *United States v. Alabama*, 691 F.3d 1269, 1298 (11th Cir. 2012) (describing the REAL ID Act as "contemplating that an alien who 'has a pending application for asylum' can obtain a driver's license").

their entry and every day of their prior presence in the United States were authorized. Doc. 1 ¶¶ 2, 16, 20, 56, 57, 66, 90, 103, 131. Such allegations are sufficient to state a claim that DDS' policy is preempted because it creates immigration classifications independent of federal law and directs state officials to act as *de facto* immigration agents and judges. *See Arizona Dream Act Coalition* (*ADAC II*) v. *Brewer*, -- F.3d --, 2016 WL 1358378, at *11 (9th Cir. 2016) (affirming a permanent injunction of Arizona's policy on driver's licenses because that policy distinguished between non-citizens based on the state's "*own* definition of 'authorized presence,' one that neither mirrors nor borrows from the federal immigration classification scheme"); *Villas at Parkside Partners v. City of Farmers Branch* (*Farmers Branch*), 726 F.3d 524, 536–37 (5th Cir. 2013) (en banc) (city ordinance "allow[ing] state courts to assess the legality of a non-citizen's presence" conflicted with federal immigration law and was therefore preempted, even though the ordinance required that assessment to be made "under federal law"); *Cent. Alabama Fair Hous. Ctr. v. Magee*, No. 2:11CV982-MHT, 2011 WL 5878363, at *2 (M.D. Ala. Nov. 23, 2011) (plaintiff was substantially likely to show conflict between a state licensing statute and federal law because defendants had "initially proposed to use their own, state-created alternative for determining whether . . . an individual has adequately demonstrated his or her

19

lawful citizenship status," and had not yet put "in place a definite process that will be in sync with federal immigration law").

Nor does the REAL ID Act authorize DDS' policy, as Defendant claims. Defendant misinterprets that Act to allow licenses to be issued only to those "lawfully admitted." Doc. 9-1 at 9. Rather, the Real ID Act treats all individuals with pending applications for adjustment of status as having "lawful status" for the purpose of eligibility for a REAL ID license, notwithstanding any prior unauthorized entry to or presence in the United States. Pub. L. No. 109-13, § 202(c)(2)(B)(ix); 6 C.F.R. § 37.11. Also contrary to Defendant's suggestion, *see* Doc. 9-1 at 6, the presumption against preemption of a state's exercise of its police powers does not apply here because DDS' policy impinges on an area of core federal concern—the authority to classify non-citizens and determine immigration status. *See United States v. Alabama*, 691 F.3d at 1296 (declining to apply the presumption to a state statute regulating contracts because "the thrust of [the statute] is to impinge on an area of core federal concern"—immigration law); *Ga. Latino All. for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1265 n.11 (11th Cir. 2012) ("[L]egislation in a field where states traditionally have power

does not defeat a claim of federal preemption.").[9] Plaintiffs have adequately

pleaded a claim for equitable relief based on federal preemption.

## III.     Plaintiffs Have Adequately Stated an Equal Protection Claim

Plaintiffs' Complaint adequately alleges discrimination on the basis of

alienage. Doc. 1 ¶¶ 1, 3, 159–67. Plaintiffs allege that DDS' policy requires non-

citizens with pending applications for adjustment of status to prove continuous past

authorized presence, but does not impose the same requirement on other driver's

license applicants who, like non-citizens with pending adjustment applications,

have "lawful status" under the REAL ID Act. *Id.* ¶¶ 2, 43, 56, 57, 162, 164–66.

That policy constitutes discrimination on the basis of alienage, for which there is

no compelling or adequate justification.

The Supreme Court has held that "[a]liens as a class are a prime example of

a discrete and insular minority," and that therefore state classifications based on

alienage are "inherently suspect and subject to close judicial scrutiny" under the

Equal Protection Clause. *Graham v. Richardson*, 403 U.S. 365, 372 (1971); *see*

---

[9] Defendant's reliance on *De Canas v. Bica*, 424 U.S. 351, 363 (1976), is
inapposite. That case, which reached only the issue of field preemption and not
conflict preemption, dealt with an employment law that operated "only with
respect to individuals whom the Federal Government has already declared cannot
work in this country." *Id.* at 363. In contrast, federal law provides that Plaintiffs
here have lawful status for purposes of receiving a driver's license, and the DDS
policy that they challenge creates a classification that does not exist in federal law.
*See also Farmers Branch*, 726 F.3d at 532 (distinguishing *De Canas* on this basis).

*also Dandamudi v. Tisch*, 686 F.3d 66, 72 (2d Cir. 2012) ("[T]he Supreme Court has repeatedly affirmed the general principle that alienage is a suspect classification."). The case that Defendant cites for a contrary proposition, *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86 (1973), does not interpret the Equal Protection Clause, but rather interprets the phrase "national origin" in Title VII of the Civil Rights Act of 1964. Defendant may survive strict scrutiny only by demonstrating that DDS' policy is "necessary to further a compelling governmental interest and narrowly tailored to that end." *Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2422 (2013) (internal quotations omitted). Defendant does not identify any justification for its policy, much less a compelling one.

Defendant also misstates the appropriate comparator group. Plaintiffs are similarly situated to other categories of individuals, including citizens, lawful permanent residents, and recipients of deferred action, whom the REAL ID Act treats as having "lawful status" for the purpose of eligibility for a driver's license. Doc. 1 ¶¶ 43, 164–66; Pub. L. No. 109-13, § 202(c)(2)(B). Plaintiffs adequately allege that DDS' policy discriminates against Plaintiffs and class members by requiring that they demonstrate continuous past authorized presence, even though DDS does not impose that requirement on other individuals with "lawful status" under the REAL ID Act. Doc. 1 ¶¶ 43, 164–66.

Defendant repeatedly argues that a driver's license is a privilege and not a right, suggesting that this distinction somehow places its actions beyond constitutional purview. However, the Supreme Court "has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.'" *Graham*, 403 U.S. at 374 (citing cases). Courts have repeatedly found Equal Protection Clause violations where a state discriminated against aliens in providing a state-created benefit. *See id.* at 376 (applying strict scrutiny to invalidate a Pennsylvania law making non-citizens ineligible for public assistance and an Arizona law restricting benefits to citizens and longtime resident aliens); *Arizona Dream Act Coalition* (*ADAC I*) *v. Brewer*, 757 F.3d 1053, 1063–67 (9th Cir. 2014) (holding that Arizona's policy of denying driver's licenses to plaintiffs was likely alienage-based discrimination in violation of the Equal Protection Clause).[10] Just as DDS cannot adopt a policy that categorically denies "the privilege" of obtaining driver's licenses to women, African Americans, or any other protected class, it is not free to deny licenses on the basis of alienage to an entire category of non-citizens who are authorized to live and work in the United States without a compelling justification.

---

[10] Contrary to Defendant's suggestion, Plaintiffs have not alleged that a driver's license is a fundamental right under the Due Process Clause, or that the denial of a license infringes Plaintiffs' right to travel. *See* Doc. 9-1 at 12–15. For that reason, *Miller v. Reed*, 176 F.3d 1202 (9th Cir. 1999), is inapposite.

Defendant cites only three cases that address the Equal Protection Clause as applied to alienage discrimination, and these are either inapposite or do not support Defendant's position. Doc. 9-1 at 12–13. In *Saldana*, 2013 WL 5658233, at *6, the court actually declined to dismiss the plaintiffs' equal protection claim. *Castillo-Solis v. State* is also inapposite because the plaintiff in that case was undocumented. 740 S.E.2d 583, 589 (Ga. 2013). *League of United Latin American Citizens* (*LULAC*) *v. Bredesen* is similarly distinguishable. 500 F.3d 523 (6th Cir. 2007). In *LULAC*, the Sixth Circuit upheld a law which limited issuance of driver's licenses to U.S. citizens and lawful permanent residents, but allowed undocumented non-citizens and non-citizens with temporary lawful status to obtain a "driving certificate." The only distinction between the license and the "driving certificate" was that the latter could not be used as official identification. The court applied a deferential standard of review based on its determination that the plaintiffs "hardly suffer[] any cognizable harm as a direct result of the classification."[11] *Id.* at 532 ("Lawful temporary resident aliens are not denied

_____

[11] In applying a rational basis review, the Sixth Circuit departed from Supreme Court precedent and numerous other cases in which the courts have applied strict scrutiny to policies that distinguish between classes of non-citizens who are authorized to live in the United States. *See Nyquist v. Mauclet*, 432 U.S. 1, 9 (1977) (applying strict scrutiny to strike down New York statute that discriminated within the class of aliens for the purpose of awarding financial aid for higher education); *Graham*, 403 U.S. at 367, 371–72 (applying strict scrutiny to invalidate

driving privileges or *any* other privilege. Inasmuch as a certificate for driving issued to a lawful temporary resident alien undisputedly affords him or her the same driving privileges that a driver license affords a citizen or lawful permanent resident alien, the instant subclass of aliens hardly suffers any cognizable harm as a direct result of the classification."). At issue here, in contrast, is the complete denial of licenses to persons who are eligible for them under federal and Georgia law. *See* Doc. 1 ¶¶ 43, 44, 46, 54, 60, 78, 97, 112, 124, 139.

## CONCLUSION

For the above reasons, Plaintiffs request that this Court deny Defendant's motion to dismiss.

---

an Arizona statute that discriminated within the class of aliens for the purpose of awarding welfare benefits); *ADAC II*, 2016 WL 1358378, at *7 n.3 ("In cases involving alleged discrimination against noncitizens authorized to be present in the United States, the Supreme Court has consistently applied strict scrutiny to the state action at issue."); *Dandamudi*, 686 F.3d at 72 (applying strict scrutiny under the Equal Protection Clause to invalidate a state law allowing only citizens and lawful permanent residents to obtain a pharmacist's license); *Pena v. Bd. of Educ. of City of Atlanta*, 620 F. Supp. 293, 299–300 (N.D. Ga. 1985) (applying strict scrutiny under the Equal Protection Clause to invalidate a school board policy that charged varying tuition rates to different classes of aliens); *cf. John Doe No. 1 v. Georgia Dep't of Pub. Safety*, 147 F. Supp. 2d 1369, 1372–73 (N.D. Ga. 2001) (applying deferential review to Georgia statute denying driver's licenses to undocumented individuals, who have no authorization to work in the United States and no "lawful status" under the REAL ID Act).

Submitted this 3rd day of June, 2016,[12]

  /s/ Gillian Gillers
Gillian Gillers (GA Bar No. 311522)
Kristi L. Graunke (GA Bar No. 305653)
Naomi R. Tsu (GA Bar No. 507612)
Southern Poverty Law Center
1989 College Avenue NE
Atlanta, GA 30317
Tel: (404) 521-6700
gillian.gillers@splcenter.org
kristi.graunke@splcenter.org
naomi.tsu@splcenter.org

Justin W. Chaney (GA Bar No. 120681)
Law Offices of Justin W. Chaney, LLC
1801 Peachtree St. NW, Suite 110
Atlanta, GA 30309
Tel: (404) 475-1616
Fax: (678) 686-8473
jchaney@lawchaney.com

*Counsel for Plaintiffs*

---

[12] Counsel certifies that this document has been prepared in Times New Roman font and 14 point, in accordance with LR 5.1, NDGa.

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2016, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notice to counsel for all parties in this action.


/s/ Gillian Gillers_____
Gillian Gillers
*Counsel for Plaintiff*